## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| ANTHONY McCLENDON, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 19-cv-373 |
| | ) | |
| v. | ) | Hon. Steven C. Seeger |
| | ) | |
| HUGHES LOCHARD, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

### MEMORANDUM OPINION AND ORDER

Plaintiff Anthony McClendon was incarcerated as a pretrial detainee at the Kendall County Jail for a few weeks in October 2018. He later filed a complaint against Dr. Hughes Lochard about the medical care that he received. McClendon claims that the doctor failed to properly treat preexisting conditions in his back and knees. In his view, Dr. Lochard should have prescribed an opioid.

Dr. Lochard moved for summary judgment. For the reasons stated below, the motion is granted.

### Background

### I.    Plaintiff's Objections to Defendant's Statement of Material Facts

Before diving into the facts, the Court will address a number of objections that McClendon made to paragraphs in Defendant's Rule 56.1 Statement of Material Facts. They fall into four categories.

First, McClendon asks the Court to strike certain paragraphs because they contain "compound statement[s] of fact." *See, e.g.,* Pl.'s Resp. to Def.'s Statement of Material Facts, at ¶¶ 2, 4, 6, 8, 10, 18, 21, 23, 27–28, 35, 37, 41, 48 (Dckt. No. 106).

Local Rules 56.1 and 56.2 govern summary judgment filings. The Court has broad discretion when enforcing the Local Rules. *See, e.g.*, *Petty v. City of Chicago*, 754 F.3d 416, 420 (7th Cir. 2014) ("We have 'consistently and repeatedly upheld a district court's discretion to require strict compliance with its local rules governing summary judgment.'") (citation omitted).

Local Rule 56.1(d) provides that a party's statement of material facts must "consist of concise numbered paragraphs." *See* Local Rule 56.1(d). It requires brevity ("concise"), but it does not include a requirement that a paragraph must contain one fact and only one fact. Nor does it say anything about "compound statement[s] of fact." As other courts in this district have held, "a statement of material facts that presents one fact at a time per paragraph would not be an efficient manner in which to present a statement of material facts and would not be consistent with Local Rule 56.1." *See Fishering v. City of Chicago*, 2009 WL 395462, at *2 (N.D. Ill. 2009); *see also Nettles-Bey v. Burke*, 2015 WL 4638068, at *5 (N.D. Ill. 2015) (same).

The Local Rules do not strictly require a one-fact-at-a-time approach. By way of analogy, when it comes to "paragraphs" in pleadings, a party "must state its claims or defenses in numbered paragraphs, each limited as far as practicable to a single set of circumstances." *See* Fed. R. Civ. P. 10(b). Note that the Federal Rules refer to a single set of "circumstances," not a single fact. *Id.* That rule provides a useful benchmark for paragraphs in a Rule 56.1 statement. Individual sentences should not be parsed and flagged by the non-movant if they contain more than one fact, unless they become user-unfriendly.

That said, stuffing too many facts into a single paragraph might make a statement of facts unwieldy, and make it tough to figure out what facts, exactly, are in dispute. A paragraph should not be so long that it interferes with the ability to provide a meaningful response. A bite-sized paragraph is more digestible. Bundling lots of facts in a single paragraph could create a hazard

2

for the non-movant, too, who might fall prey to "gotcha" by overlooking one of the facts in the bundle. The paragraphs should be short enough to allow for a straightforward, comprehensible, easy-to-follow response.

From a pragmatic standpoint, the main thing is to include enough facts to allow the parties to present their evidence and highlight what is truly in dispute (and what is not). The end goal is a set of user-friendly submissions for the Court, so that the Court can readily determine if there is a need for a trial. District courts are well positioned to figure out when paragraphs are cluttered with too much material.

McClendon cites a case from this district for the proposition that paragraphs may not include multiple facts. *See Malec v. Sanford*, 191 F.R.D. 581, 583 (N.D. Ill. 2000). But *Malec* simply holds that it is inappropriate for a party to write its statement of facts in an intentionally confusing manner. *Id.* ("[I]t is inappropriate to confuse the issues by alleging multiple facts in a single paragraph in hopes of one's opponent missing one."). It does not support a blanket rule against paragraphs that include multiple facts.

After reviewing each of the paragraphs in Defendant's Statement of Material Facts, the Court concludes that they comply with the Local Rules. Many of the paragraphs contain only a sentence or two. For the others, the subject matter is cohesive enough that the sentences can stick together in a single paragraph. The proof is in the pudding – most of the time, McClendon simply admitted the facts in each paragraph. He did not seem to have much trouble parsing the content, and the Court didn't have trouble, either.

Second, McClendon asks the Court to strike a number of paragraphs because he did not receive Exhibit 3 to Defendant's Statement of Facts. *See, e.g.*, Pl.'s Resp. to Def.'s Statement of

Material Facts, at ¶¶ 18, 20, 22–24 (Dckt. No. 106). Exhibit 3 is a 55-page collection of McClendon's own medical records. *See* Medical Records (Dckt. No. 86-3).

After reviewing that response, this Court *sua sponte* ordered defense counsel to send McClendon a copy of Exhibit 3. *See* 6/14/21 Order (Dckt. No. 111). This Court also gave McClendon a month to file a supplemental response and address the medical records, so that he had a full opportunity to respond. *Id.* Defense counsel then filed a certificate of service, confirming that he sent McClendon a second copy of the medical records. *See* Certificate of Service (Dckt. No. 112).[1]

The deadline for a supplemental response came and went, but McClendon filed nothing. So, his request to strike those paragraphs is denied.

Next, McClendon asks the Court to strike a number of paragraphs because they contain legal arguments or opinions as opposed to facts. *See, e.g.*, Pl.'s Resp. to Def.'s Statement of Material Facts, at ¶¶ 35, 40–42, 44, 50–51 (Dckt. No. 106). It is true that the Local Rules require a statement of "facts," not legal arguments. *See* Local Rule 56.1(d). Legal arguments belong in

---

[1] This Court directed Defendant to clear up whether McClendon ever received a copy of the medical records during discovery. *See* 6/14/21 Order (Dckt. No. 111). Defendant responded, but the response was a bit unclear. Defendant's Court-ordered certificate of service states that counsel sent an "*additional* copy" of the medical records to McClendon on June 15, 2021, which suggests that he received an earlier copy. *See* Certificate of Service (Dckt. No. 112) (emphasis added). In a similar vein, Defendant filed a statement saying that defense counsel "re-submitted" the medical records to McClendon on June 15, 2021. *See* Def.'s Resp. (Dckt. No. 113). But the statement falls short of confirming when, exactly, McClendon received a copy during discovery. The response confirms that McClendon received "notice" of the subpoenas for the medical records, and "was aware" that Defendant was collecting that information. *Id.* at 1–2. McClendon "was advised via notice that he could obtain copies of records from the vendor." *Id.* at 2. But Defendant seemingly did not produce copies of those records to Plaintiff because he never asked for them. *Id.* ("Accordingly, no subpoenaed records were produced to Plaintiff."). McClendon apparently did request and receive some medical records from the BOP, including 337 pages in April 2019, 105 pages in September 2019, and 63 pages in February 2020. *See* Dckt. No. 113-2. But Defendant did not explain whether those pages are the same as Exhibit 3 to his summary judgment motion. In any event, the point is now moot because this Court directed defense counsel to send McClendon another copy. Defense counsel mailed that copy on June 15, 2021, but McClendon has not responded.

the response brief.  *See* Local Rule 56.1(b)(1).  But this Court is well equipped to disregard any legal argumentation in a Rule 56.1 statement of facts.

Finally, McClendon asks the Court to strike certain paragraphs because they are "immaterial" to the case.  *See, e.g.*, Pl.'s Resp. to Def.'s Statement of Material Facts, at ¶¶ 5, 11, 28  (Dckt. No. 106).  Once again, it is true that the Local Rules require a statement of "material" facts.  *See* Local Rule 56.1(a)(2).  To the extent any facts are immaterial, the Court will disregard them.

Having resolved the objections, the Court will now turn to the facts themselves.

## II.     Facts

### A.     McClendon's Injuries

Years before incarceration, Plaintiff Anthony McClendon suffered a series of injuries to his knees and back from playing sports and from car accidents.  Those injuries resulted in chronic pain, which McClendon treated with a combination of surgeries, physical therapy, and pain medication.

McClendon's issues began in 1996, when he injured one of his kneecaps while playing basketball.  *See* Pl.'s Resp. to Def.'s Statement of Material Facts, at ¶ 6 (Dckt. No. 106).  After the incident, McClendon reported a "general achiness" in both knees.  *Id*.

In 2002 or 2003, McClendon injured his back in a car accident.  *Id.* at ¶ 7.  McClendon reports that he "flipped over in the car and went through the front windshield," which resulted in "swelling" and "a bulge" in his back.  *Id*.

In 2011, McClendon re-injured both of his knees playing basketball, which caused swelling, weakness, and pain.  *Id.* at ¶¶ 11–12.  McClendon received two forms of treatment.  He would periodically go to the hospital to have his knees drained of fluid.  *Id*.  And he started

5

taking "Tylenol 3, Norco, and other prescriptions for pain and inflammation." *Id*. at ¶ 13. He does not reveal what doctor, or what facility, issued those prescriptions. Tylenol 3 is a combination of acetaminophen and an opioid (codeine). *Id*. at ¶ 14. Norco is a brand name of a drug containing a combination of acetaminophen and an opioid (hydrocodone). *Id*. at ¶ 15.

The parties agree that McClendon continued taking those pain medications until 2017. *Id*. at ¶ 13 ("Plaintiff advised that, during the period from 2011-2017, he received Tylenol 3, Norco, and other prescriptions for pain and inflammation in his knees."). In other paragraphs, they agree that he continued taking Norco well into 2018. *Id*. at ¶¶ 23, 26. So, the timeline around his prescriptions for pain medication is a little muddled. Maybe he continuing taking Norco in 2018, but stopped taking Tylenol and other medicine in 2017.

In 2014, McClendon had surgery to address issues with his back related to the 2002–2003 car crash. *Id*. at ¶ 7. After surgery, he "still experienced issues with his back," including chronic pain. *Id*. at ¶¶ 8–9. So, beginning in 2015, McClendon attended physical therapy to address those lingering issues, which included "TENS units [*i.e.*, a transcutaneous electrical nerve stimulation unit, which is sometimes used to treat pain], massages, and stretches." *Id*. The physical therapy helped loosen his back muscles, "but most of the time" he still experienced "uncontrollable pain." *Id*. at ¶ 9. He continued physical therapy until 2018. *Id*. at ¶ 8.

In the meantime, in 2017, McClendon was involved in another car accident and injured both knees again. *Id*. at ¶ 17. This time, he was a passenger sitting in the backseat, so when the car crashed, his knees slammed into the interior of the car. *Id*. "After the accident, McClendon felt that something was loosened up in his right knee, and that he could move his kneecap around." *Id*.

6

### B.    Scheduling Knee Surgeries

After that accident, McClendon met with Dr. Matthew Marcus, an orthopedist at UIC, in September 2017.  *Id.* at ¶ 18.  McClendon complained of "10/10" pain in his left knee, and "7/10" pain in his right knee.  *Id.*  However, Dr. Marcus concluded that McClendon had full range of motion, and full strength, in both knees.  *Id.*

Dr. Marcus directed McClendon to participate in physical therapy, and scheduled him for further evaluation and imaging.  *Id.*  McClendon began physical therapy, which provided "temporary relief."  *Id.* at ¶ 19.

McClendon met with Dr. Marcus again in December 2017.  *Id.* at ¶ 20.  McClendon reported that his pain was a 10/10.  *Id.*  Dr. Marcus found that McClendon had full range of motion and walked with a "non-antalgic gait."  *Id.*

This time, Dr. Marcus recommended surgery on McClendon's right knee, and scheduled surgery for January 29, 2018 (*i.e.,* just a month later).  *Id.* at ¶ 21.  But only two weeks before the surgery, on January 11, 2018, McClendon cancelled the procedure, explaining that he did not want to be wheelchair-bound at his son's high school graduation that summer.  *Id.*

On February 2, 2018, McClendon went to a different facility, Rush University Primary Care, to see a different doctor, Dr. Barge.  *Id.* at ¶ 23.  McClendon told Dr. Barge that his surgery was discontinued "due to knee effusion," but that he had surgery scheduled later that month.  *Id.*  Dr. Barge refilled McClendon's Norco prescription and advised that he needed to get off narcotics after his surgery.  *Id.*

Five days later, on February 7, 2018, McClendon met with Dr. Marcus (from UIC) a third time.  *Id.* at ¶ 22.  This time, McClendon reported that his pain was 6/10.  *Id.*  Again, Dr. Marcus noted that McClendon appeared to have full range of motion and strength.  *Id.*  The office

rescheduled McClendon's surgery for June 25, 2018, and scheduled a presurgical appointment for May. *Id*.

McClendon did not show up for that presurgical appointment, so his surgery was cancelled again. *Id.* at ¶ 24. He was rescheduled to see Dr. Marcus on June 27, 2018. *Id*.

But he didn't make that rescheduled appointment because he entered custody. On June 25, 2018, McClendon was incarcerated at Stateville Correctional Center due to a parole violation. *Id.* at ¶ 25. At Stateville, McClendon was assessed by medical providers, who prescribed Robaxin and Motrin. *Id.* According to McClendon, those medications did "not really" help him with his pain. *Id.*

McClendon was later released from Stateville. On August 13, 2018, he went back to Rush University for a refill of his pain medication. *Id.* at ¶ 26. McClendon received a prescription for Norco at that visit. *Id*.

On August 30, 2018, McClendon went back to UIC to meet with Dr. Marcus. *Id.* at ¶ 27. McClendon indicated that his pain in his right knee was 10/10 and that he had discomfort in his left knee. *Id.* McClendon said that he wanted to proceed with the surgery. *Id.* He scheduled an appointment for mid-October to discuss surgery again. *Id.*

## C. Treatment at Kendall County Jail

McClendon didn't make that appointment, either. On October 2, 2018, McClendon was arrested on federal charges for attempting to sell fentanyl and heroin to an undercover officer. *Id.* at ¶ 28. McClendon was taken to the Kendall County Jail later that day. *Id.* at ¶ 29.

The next day, McClendon saw a nurse, who completed an initial medical history and health appraisal. *Id.* McClendon informed the nurse that he was currently under the care of "Dr. Kantana" at Rush Hospital. *Id.* at ¶ 31. McClendon did not indicate that he was under the care

of a medical practitioner at UIC. *Id.* McClendon also reported that he had several prior surgeries, including to his shoulder and back, and that he had a broken knee. *Id.* at ¶¶ 32–33. However, he denied any other recent broken bones or deformities and denied any arthritis/joint mobility issues or deformities. *Id.*

A little over a week later, on October 11, 2018, Dr. Lochard (the defendant) saw McClendon for a sick call. *Id.* at ¶ 34. Someone at the facility took McClendon's vital signs before he saw Dr. Lochard, and recorded a pulse of 63 beats per minute, a respiratory rate of 18 breaths per minute, and a blood pressure of 121/82. *Id.* Dr. Lochard asserts that these vital signs are inconsistent with a person experiencing extreme pain. *Id.* McClendon objects to that characterization. *Id.*

During the exam, McClendon informed Dr. Lochard that he had "lower back pain in 2013, with surgery and a subsequent infection, and that he had prior injuries in both knees." *Id.* at ¶ 36. Dr. Lochard noted signs of a surgical operation on his lower back. *Id.* at ¶ 37. The physician observed that McClendon was able to "ambulate," and to squat part of the way down, but complained of pain in both knees. *Id.* Dr. Lochard also reviewed a collection of McClendon's medical records that the prison had received from Rush University. *Id.* at ¶ 38. The medical records showed chronic knee and back pain. *Id.* at ¶ 39.

Based on his in-person assessment and his review of the medical records, Dr. Lochard believed that McClendon's pain could be treated with pain medications other than Norco (an opioid). *Id.*; *see also id.* at ¶ 42. Dr. Lochard testified that, in his medical judgment as a correctional care provider, writing an opioid prescription for an incarcerated individual requires "extreme care." *Id.* at ¶ 42. He opined that a doctor should prescribe opioids for an inmate only after other modalities of treatment have proven unsuccessful. *Id.*

9

On October 11, 2018, Dr. Lochard prescribed several medications for McClendon. *Id.* at ¶ 43. These medications included: (1) Extra Strength Tylenol for pain; (2) Cymbalta, an antidepressant and nerve pain medication; and (3) Neurontin, a nerve pain medication. *Id.*

McClendon refused to take the prescribed medications. *Id.* at ¶ 45. He asserted that he did not want to pay for medications that he did not believe would ease his pain. *Id.* McClendon recalled taking Tylenol in prior years but did not recall the dose or the exact time. *Id.* at ¶ 46. McClendon could not recall whether he had taken Cymbalta or Neurontin, or whether he had taken the combination of Tylenol, Cymbalta, and Neurontin. *Id.* at ¶ 47.

### D. Treatment at the MCC

He didn't stay long at the Kendall County Jail. On October 31, 2018, less than a month after his arrival, McClendon was transferred to the Metropolitan Correctional Center ("MCC"). *Id.* at ¶ 52. About a week later, on November 6, 2018, a physician at the MCC assessed him and prescribed regular strength Tylenol. *Id.* McClendon took the Tylenol, but reported that it did not help his pain. *Id.* at ¶ 54.

On January 8, 2019, McClendon had a follow-up appointment with an MCC physician. *Id.* at ¶ 55. The doctor prescribed Meloxicam (a nonsteroidal anti-inflammatory, like ibuprofen) and referred McClendon to physical therapy. *Id.* at ¶¶ 55–56.

On March 13, 2019, McClendon was referred to see an outside orthopedist for lower back and right knee pain. *Id.* at ¶ 57. At that time, McClendon had a normal gait but a pain level of 10/10. *Id.* The orthopedist recommended a Tylenol #3 prescription, physical therapy, and imaging. *Id.*

On May 30, 2019, McClendon saw a physician at the MCC for his lower back and knee pain. *Id.* at ¶ 58. McClendon indicated that he had pain of 10/10, even after physical therapy and pain medication. *Id.*

On November 8, 2019, McClendon was referred to an outside provider for his lower back pain. *Id.* at ¶ 59. McClendon indicated that his pain level was 10/10. *Id.* McClendon received a steroid injection for pain. *Id.*

He was seen again on December 16, 2019, for lower back pain. *Id.* at ¶ 60. McClendon reported pain intensity of 8/10. *Id.* McClendon received another steroid injection, which helped a little before the pain returned. *Id.*

On January 29, 2020, an orthopedist saw McClendon for his lower back and knee complaints. *Id.* at ¶ 61. The orthopedist recommended surgery for McClendon's right knee, but McClendon refused because he wanted to wait until he was released to see his own physician. *Id.* at ¶¶ 61–62.

### E.    The Lawsuit

McClendon filed suit in January 2019, a few months after leaving the Kendall County Jail. He originally filed federal (*i.e., Bivens*) claims against three state actors: Dr. Lochard, plus a nurse and the Chief of Staff of the Jail. *See* Cplt., at 1 (Dckt. No. 1). Judge Dow, this Court's predecessor before reassignment, dismissed the nurse and the Chief of Staff. *See* 4/17/19 Order (Dckt. No. 10). Even though McClendon checked the box on the form for a *Bivens* claim (not a section 1983 claim) in his *pro se* complaint, the Court treated the complaint as a section 1983 claim under the Fourteenth Amendment, which governs medical care for pretrial detainees. *Id.*

McClendon complained about a series of requests that he had made – and that the Kendall County Jail denied – for medication and accommodations. According to the complaint,

11

the Jail denied a request to "stop from traveling in the small van to and from court," a "two hour trip" that caused pain and swelling. *See* Cplt., at 4 (Dckt. 11). He complained that Dr. Lochard did not prescribe Norco. *Id.* at 5. Dr. Lochard denied his request for x-rays and an MRI, too. *Id.* The doctor also denied his request for a bed in the medical unit, thus forcing McClendon to sleep on his usual bunk. *Id.* at 6. "He denied me the mattress for no reason." *Id.*

After discovery, Dr. Lochard moved for summary judgment. McClendon's initial response did not comply with the Local Rules. So this Court struck the filing but *sua sponte* gave him another chance. *See* 4/26/21 Order (Dckt. No. 101). McClendon later filed a supplemental response, which the Court accepted. *See* Pl.'s Resp. to Def.'s Statement of Material Facts (Dckt. No. 106).

## Legal Standard

A district court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See* Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A genuine issue of material fact does not mean the mere existence of "some alleged factual dispute between the parties," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986), or "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, a genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Estate of Simpson v. Gorbett*, 863 F.3d 740, 745 (7th Cir. 2017) (quoting *Anderson*, 477 U.S. at 248). A fact is material if it might affect the outcome of the suit. *See First Ind. Bank v. Baker*, 957 F.2d 506, 508 (7th Cir. 1992).

The moving party bears the initial burden of demonstrating the lack of any genuine issue of material fact. *See Celotex*, 477 U.S. at 323. Once the party moving for summary judgment demonstrates the absence of a disputed issue of material fact, "the burden shifts to the non-moving party to provide evidence of specific facts creating a genuine dispute." *Carroll v. Lynch*, 698 F.3d 561, 564 (7th Cir. 2012). The non-movant must go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial." *Hannemann v. Southern Door Cty. Sch. Dist.*, 673 F.3d 746, 751 (7th Cir. 2012) (quoting *Anderson*, 477 U.S. at 250). Thus, "summary judgment must be entered 'against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *Cooper v. Lane*, 969 F.2d 368, 371 (7th Cir. 1992) (quoting *Celotex*, 477 U.S. at 323); *Gabb v. Wexford Health Sources, Inc.*, 945 F.3d 1027, 1032 (7th Cir. 2019).

When deciding a motion for summary judgment, the Court views the facts in the light most favorable to the non-moving party, and draws all reasonable inferences in his or her favor. *See Apex Digital, Inc. v. Sears, Roebuck & Co.*, 735 F.3d 962, 965 (7th Cir. 2013) (citation omitted).

### Discussion

The Fourteenth Amendment governs medical care claims by pretrial detainees. *See Miranda v. County of Lake*, 900 F.3d 335, 350 (7th Cir. 2018). "After *Miranda*, . . . the controlling inquiry for assessing a due process challenge to a pretrial detainee's medical care proceeds in two steps." *See McCann v. Ogle County*, 909 F.3d 881, 886 (7th Cir. 2018). That

two-step process assumes that the claim is about an objectively serious medical condition (which could be considered a third step), which is not in dispute here.[2]

The first step "focuses on the intentionality of the individual defendant's conduct," and "'asks whether the medical defendants acted purposefully, knowingly, or perhaps even recklessly when they considered the consequences of their handling of [plaintiff's] case.'" *Id.* (quoting *Miranda*, 900 F.3d at 353). A "showing of negligence or even gross negligence will not suffice." *Id.* Instead, a defendant's conduct must be "'something akin to reckless disregard.'" *See Miranda*, 900 F.3d at 353 (quoting *Gordon v. County of Orange*, 888 F.3d 1118, 1125 (9th Cir. 2018)).

The second step is an objective analysis of the reasonableness of the defendant's medical actions. "This standard requires courts to focus on the totality of facts and circumstances faced by the individual alleged to have provided inadequate medical care and to gauge objectively – without regard to any subjective belief held by the individual – whether the response was reasonable." *See McCann*, 909 F.3d at 886.

---

[2] *Miranda* addressed whether a subjective standard continued to apply to claims by pretrial detainees about inadequate medical care under the Fourteenth Amendment in light of *Kingsley v. Hendrickson*, 576 U.S. 389 (2015). *See Miranda*, 900 F.3d at 352 (concluding that "medical-care claims brought by pretrial detainees under the Fourteenth Amendment are subject only to the objective unreasonableness inquiry identified in *Kingsley*"). The Seventh Circuit in *Miranda* gave no indication that it was jettisoning the requirement that the medical condition must be objectively serious. In fact, the Seventh Circuit explicitly acknowledged that the doctors in *Miranda* "concede[d] . . . that [the decedent's] medical condition was objectively serious." *Id.* at 347; *see also Farmer v. Brennan*, 511 U.S. 825, 834 (1994) ("[T]he deprivation alleged must be, objectively, 'sufficiently serious . . . .'") (citation omitted) (addressing the deliberate indifference standard under the Eighth Amendment). In a concurring opinion in *Hardeman v. Curran*, 933 F.3d 816 (7th Cir. 2019), Chief Judge Sykes noted that there are "three elements" (not two) of a claim about inadequate medical care by a pretrial detainee under the Fourteenth Amendment. *Id.* at 827 (Sykes, J., concurring in the judgment). A pretrial detainee must prove (1) an "objectively serious" medical condition; (2) a purposeful, knowing, or reckless act by the defendant; and (3) an act that is "objectively unreasonable." *Id.* Here, the parties do not dispute that McClendon's pain constituted an objectively serious medical condition.

Applying that standard, a district court must look to the overall course of treatment, and consider whether "medical staff diligently attended" to the plaintiff's needs and whether the plaintiff was "examined . . . regularly and promptly to address his complaints." *See Williams v. Ortiz*, 937 F.3d 936, 943 (7th Cir. 2019).

The parties do not dispute that McClendon's pain from his knee and back conditions constituted a serious medical condition. The debate here is about the final element. That is, the question is the reasonableness of the medical treatment. Or more precisely, the question is whether McClendon came forward with evidence that Dr. Lochard's care was objectively unreasonable, and thus cleared the summary judgment hurdle.

Dr. Lochard argues that treating McClendon's pain conservatively, without narcotics and other accommodations, was objectively reasonable. McClendon argues that Dr. Lochard should have prescribed Norco and provided other accommodations, such as physical therapy, a Tens Unit (again, an electrical device used to treat pain), heating pads, a Bed Pass and a Van Pass. In addition, he contends that Dr. Lochard should have ordered additional testing such as x-rays and/or an MRI.

The undisputed facts demonstrate that McClendon has no claim. Based on the record at hand, no reasonable jury could conclude that Dr. Lochard's decision to treat McClendon's pain conservatively at the outset of incarceration was objectively unreasonable.

Pretrial detainees do not have a constitutional right to dictate their medical care. Mere disagreement with a doctor's medical judgment is not enough to establish that a course of medical treatment was objectively unreasonable. *See Williams*, 937 F.3d at 944 (holding that a detainee's disagreement with a course of treatment "does not mean the course of treatment was objectively unreasonable"); *Gaston v. Beatty*, 2020 WL 1288878, at *5 (N.D. Ill. 2020)

(explaining that treatment given to a detainee plaintiff was not unreasonable "even if [plaintiff] did not agree with her diagnosis"); *Voss v. Marathon County*, 2021 WL 148732, at *10 (W.D. Wis. 2021) ("[Plaintiff] may have wanted different treatment, but his disagreement with [defendant] doesn't amount to a constitutional violation."); *Smith v. Kapotas*, 2020 WL 553619, at *5 (N.D. Ill. 2020) ("[A] pretrial detainee is not entitled to the treatment of his choice, nor may he state a constitutional claim merely by second-guessing a medical provider's professional judgment . . . ."); *Burton v. Downey*, 805 F.3d 776, 785 (7th Cir. 2015) ("Surely Burton would have preferred Vicodin to Ultram, or to have seen a doctor who would have prescribed narcotics, but detainees are not entitled to receive 'unqualified access to healthcare.'") (quoting *Hudson v. McMillian*, 503 U.S. 1, 9 (1992)) (applying the Fourteenth Amendment before *Kingsley v. Hendrickson*, 576 U.S. 389 (2015)).[3]

    A jail physician is an inmate's primary care doctor, so he is free to make an independent medical determination about the necessity of certain treatments or medications. *See Holloway v. Delaware Cty. Sheriff*, 700 F.3d 1063, 1074 (7th Cir. 2012). "[S]o long as the determination is based on the physician's professional judgment and does not go against accepted professional standards," there is no constitutional violation. *Id.*

---

[3] McClendon was a pretrial detainee, so the objective unreasonableness standard under the Fourteenth Amendment applies. The Eighth Amendment applies to convicted prisoners. But on this point, the principle is the same. Prisoners (like pretrial detainees) have no constitutional entitlement to "demand specific care" or even receive the "best care possible." *Arnett v. Webster*, 658 F.3d 742, 754 (7th Cir. 2011); *see also Lockett v. Bonson*, 937 F.3d 1016, 1023 (7th Cir. 2019) ("A '[d]isagreement between a prisoner and his doctor, or even between two medical professionals, about the proper course of treatment generally is insufficient, by itself, to establish an Eighth Amendment violation.'") (quoting *Pyles v. Fahim*, 771 F.3d 403, 408 (7th Cir. 2014)); *Snipes v. DeTella*, 95 F.3d 586, 591 (7th Cir. 1996) ("[M]edical decisions that may be characterized as 'classic examples of matters for medical judgment,' such as whether one course of treatment is preferable to another, are beyond the [Eighth] Amendment's purview. Such matters are questions of tort, not constitutional law.") (citing *Estelle v. Gamble*, 429 U.S. 97, 107 (1976)); *Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997) ("Under the Eighth Amendment, [plaintiff] is not entitled to demand specific care. She is not entitled to the best care possible. She is entitled to reasonable measures to meet a substantial risk of serious harm to her.").

A physician enjoys wide boundaries when making medical decisions in a custodial setting, especially when treating pain. *See Williams v. Patton*, 761 F. App'x 593, 597 (7th Cir. 2019) (unpublished) (observing in a Fourteenth Amendment context that a plaintiff must show that medical treatment was such "a significant departure from professional norms" that it was objectively unreasonable); *Burton*, 805 F.3d at 785–86 (noting that the fact that a different doctor prescribed plaintiff's preferred treatment is merely evidence "that another doctor would have followed a different course of treatment," which, on its own, is "insufficient to sustain a deliberate indifference claim"); *Holloway*, 700 F.3d at 1073, 1075 (holding that a doctor did not act with deliberate indifference when he prescribed non-narcotic pain medications, and plaintiff presented no evidence that the doctor intended to cause plaintiff pain or that prescribing non-narcotic medications would not alleviate plaintiff's pain); *see also Williams v. Hodge*, 2013 WL 5550492, at *2 (S.D. Ill. 2013) (concluding that a wheelchair-bound inmate failed to demonstrate that the denial of physical therapy was anything more than a disagreement about the proper way to treat his medical needs).

That deference is especially deep and wide for pain killers. Opioids are addictive, and are prone to abuse. Prescribing opioids – especially in a jailhouse setting – requires special care. *See Snipes v. DeTella*, 95 F.3d 586, 591 (7th Cir. 1996) ("The administration of pain killers requires medical expertise and judgment."); *Lockett v. Bonson*, 937 F.3d 1016, 1024–25 (7th Cir. 2019) ("We routinely have rejected claims, however, where a prisoner's claim is based on a preference for one medication over another unless there is evidence of a *substantial* departure from acceptable professional judgment.") (emphasis in original) (rejecting a claim about oxycodone, an opioid).

Here, Dr. Lochard had one consultation with McClendon on October 11, 2018, about his pain management. *See* Pl.'s Resp. to Def.'s Statement of Material Facts, at ¶¶ 34–39 (Dckt. No. 106). Dr. Lochard examined McClendon, noted his vital signs, and concluded, in his professional medical judgment, that McClendon's vital signs did not indicate a person in acute pain. *Id.* at ¶ 35. McClendon takes issue with that conclusion, but he offers no evidence that it was objectively unreasonable. *Id.*

During the exam, McClendon was able to ambulate and squat at least part way down. *Id.* at ¶ 37. Dr. Lochard reviewed McClendon's medical records, learned about his previous injuries, and discussed his request for Norco and other accommodations. *Id.* at ¶¶ 38–39.

Based on that initial consultation, Dr. Lochard concluded that McClendon's pain could be treated with non-narcotic pain medications. *Id.* at ¶ 42. The fact that McClendon requested a narcotic while incarcerated played a significant role in the medical decision. "In Dr. Lochard's medical judgment as a correctional care provider, writing an opioid prescription for an incarcerated individual must be done with extreme care and only when other modalities of treatment have proven to be unsuccessful." *Id.* Dr. Lochard took into account security concerns, facility resources, and potential secondary gain issues with incarcerated individuals (meaning exaggerating symptoms for some other reason). *Id.* at ¶¶ 40–42.

Dr. Lochard did not prescribe the narcotic that McClendon desired. But he did prescribe alternatives. Specifically, he prescribed three other medications: (1) Extra Strength Tylenol for pain; (2) Cymbalta, an antidepressant and nerve pain medication; and (3) Neurontin, a nerve pain medication. *Id.* at ¶ 43.

McClendon refused to take the prescribed medications. *Id.* at ¶ 45; *see also* McClendon Decl., at ¶¶ 36–37 (Dckt. No. 104). He did not want to pay for medications that he did not

believe would assist him with his pain. Without McClendon trying the prescribed medications, Dr. Lochard had no way of knowing if his initial prescribed treatment was working and if there was any need to alter that treatment. *See* Pl.'s Resp. to Def.'s Statement of Material Facts, at ¶ 50 (Dckt. No. 106). Dr. Lochard couldn't assess whether those medications sufficed because McClendon refused to take them.

Dr. Lochard did not treat McClendon again, as he was transferred twenty days later to the MCC. Notably, at the MCC, McClendon received only over-the-counter Tylenol for over two months and then received a nonsteroidal anti-inflammatory, like ibuprofen, and was referred to physical therapy.

McClendon may have preferred to receive Norco and other accommodations from the start from Dr. Lochard. But there is nothing in the record to support the notion that it was objectively unreasonable for Dr. Lochard to start conservatively with three other medications, especially because McClendon requested an opioid. *See Voss*, 2021 WL 148732, at *5 ("It is true that Voss expressly requested a narcotic, but medical staff are entitled to deference when choosing an appropriate pain reliever. . . . And narcotics impose heightened risks of abuse and addiction, so it is appropriate for medical staff to be hesitant before prescribing them.") (citations omitted).

As one court aptly observed, "I am not aware of any case in which this court, the Court of Appeals for the Seventh Circuit, or the Supreme Court has held that an incarcerated person was constitutionally entitled to narcotics." *Id.* This Court isn't aware of any basis for a constitutional entitlement to narcotics, either. At the very least, nothing in this record supports any such claim.

McClendon relies on medical care and testing that he later received at the MCC, including x-rays. *See* McClendon Decl., at ¶¶ 51–58, 61, 64 (Dckt. No. 104). But even viewing

that evidence in the light most favorable to McClendon, it is not enough to survive summary judgment. The fact that another doctor may have treated him differently does not mean that his treatment at the jail was objectively unreasonable. *See Voss*, 2021 WL 148732, at *6; *Burton*, 805 F.3d at 786 ("[E]vidence that another doctor would have followed a different course of treatment is insufficient to sustain a deliberate indifference claim.") (applying deliberate indifference standard to pretrial detainee's claim before *Kingsley*); *see also Lockett*, 937 F.3d at 1023 ("A '[d]isagreement . . . between two medical professionals, about the proper course of treatment generally is insufficient, by itself, to establish an Eighth Amendment violation.") (citation omitted). The fact that two doctors may treat the same patient differently does not mean that one of the doctors is objectively unreasonable. And in any event, no one at the MCC prescribed McClendon opioids.

McClendon's declaration claims that a doctor at Thorek Hospital (Dr. Minardi) commented that the care by Dr. Lochard was "reprehensible," and that "if subpoenaed he would so testify." *See* McClendon Decl., at ¶ 60 (Dckt. No. 104). But that out-of-court statement is hearsay. McClendon offers no testimony from Dr. Minardi himself about whether the care by Dr. Lochard was objectively unreasonable. The time to submit evidence was now, but McClendon came forward with nothing. *See Hammel v. Eau Galle Cheese Factory*, 407 F.3d 852, 859 (7th Cir. 2005) ("Summary judgment is not a dress rehearsal or practice run; it is the put up or shut up moment in a lawsuit, when a party must show what evidence it had that would convince a trier of fact to accept its version of the events.").

McClendon also complains about the failure to provide other accommodations, such as special transportation to court (in a larger vehicle), a different bed, and so on. Suffice it to say

that there is nothing in the record to support the notion that denying such requests was objectively unreasonable.

In the end, McClendon simply disagrees with the decision of Dr. Lochard to prescribe something other than opioids during his brief incarceration at the Kendall County Jail.  There is nothing in the record to support the notion that that medical decision was objectively unreasonable, so McClendon has no constitutional claim.

## Conclusion

For the reasons stated above, the Court grants Dr. Lochard's motion for summary judgment.


Date:  July 27, 2021

Steven C. Seeger
United States District Judge